Honorable Barbara J. Rothstein

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

JAMES R. HAUSMAN,

        Plaintiff,

v.

HOLLAND AMERICA LINE-U.S.A.,
a Washington corporation; HOLLAND
AMERICA LINE, INC., a Washington
corporation; HOLLAND AMERICA LINE
N.V., a Curacao corporation; and HAL
ANTILLEN N.V., a Curacao corporation.

        Defendants.

Case No. 2:13-cv-00937-BJR

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS MOTION TO VACATE
JUDGMENT AND FOR DISMISSAL, OR
ALTERNATIVELY MOTION TO VACATE
JUDGMENT AND FOR NEW TRIAL BASED
ON PLAINTIFF'S FRAUD ON THE COURT,
WILLFUL VIOLATION OF THIS COURT'S
DISCOVERY ORDER, INTENTIONAL
DESTRUCTION OF EVIDENCE, AND
WITNESS TAMPERING**

**NOTE ON MOTION CALENDAR:
Friday, December 4, 2015**

### A.    Introduction

*"…guilt is often assumed before innocence can be proven."*

    — Miguel Syjuco

After extensive litigation and discovery, and a full and fair trial, HAL's version of events was rejected by the jury. Now, HAL seeks to start a second litigation, claiming "new evidence"–-delivered by one former Gold Center employee, who was fired for theft. The allegations of this particular former employee do not establish sufficient cause to overturn the jury's verdict. "Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 401 (1981), quoting *Baldwin v. Traveling Men's Assn.*, 283 U.S. 522, 525 (1931).

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington 98337
(360) 782-4300

When the sensational charges are examined calmly and rationally, they are contradicted by (1) statements made by Ms. Mizeur to both law firms before the trial began, (2) Ms. Mizeur's contemporaneous emails, (3) the sworn testimony of numerous other witnesses, and (4) other objective known facts. They are also colored by Ms. Mizeur's extreme bias and misconduct, including unsuccessful extortion attempts.

To the extent that Ms. Mizeur's allegations are not complete fabrications, they are also not new or surprising. Although such allegations are recounted in HAL's brief as if startling revelations, they are old news in this litigation. Did Mr. Hausman do his own driving to Wisconsin? Yes, and he admitted so in his deposition and at trial. Did he and Mrs. Hausman have marital troubles causing him to live in hotels at one point during the pendency of this litigation? Yes, and they both testified to it in their depositions. Does Mr. Hausman drink a lot of beer? Yes, and numerous witnesses have given their evaluations of how much he drinks—all with slightly different impressions and views. Such allegations are insufficient to establish misconduct or require a new trial.

## B.   Context.

It is important to note at the onset that Ms. Mizeur was not deposed by either party, nor was she called as a witness at trial. Thus, whether she lied before trial, or is lying now, the jury was not influenced by her testimony. She has come forward now, alleging "she could not bring herself to stay silent, knowing what she knows." Dkt 216, at 18. She has not, however, recanted any testimony previously made under oath, because she has never given any such testimony. HAL has simply found a witness who has made many allegations designed to hurt Mr. Hausman and his case. Indeed, contrary to the assertion that she has come forward out of pure motives and "listened to her true self," the simple fact is that she is on a vendetta against Mr. Hausman following an unsuccessful extortion attempt.

Three facts tell the real story of Amy Mizeur's allegations:

   1.   ***She was fired for forgery and theft in April of 2015.*** *See* Decl. of Gilliam and Decl. of Wagoner.

   2.   ***She blamed Mr. Hausman for her termination***:

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

Am I supposed to take care of my son now that you took my job away and my insurance?

I'd like an answer to that one or I can call Ellen [at Neilson Shields] and ask her…

J. Hausman Decl., Exh. 1.

3. ***She threatened to ruin Mr. Hausman unless he paid her money to "go away***."

So how would you like to handle this?  <u>Since you have ruined my family and my life I willing to do the same to you and yours</u>. I have no money, no job, no insurance, no way to take care of my son all because of you not getting your assistant to fuck you so you could hand out cash. I can start forwarding my emails and telephone records to Ellen at HAL. I guess you are leaving me no choice. <u>I asked for you to pay me off</u> like you have the rest of the people you have fucked over in this world. You aren't willing to do that? Then I will make sure everyone including your wife and child know everything I know about you.  And that is not going to be pretty.

J. Hausman Decl., Exh. 2 (underline emphasis added).

Prior to being terminated, however, Ms. Mizeur had a much more supportive view of Mr. Hausman:

I am inquiring about this study on behalf of my employer. He is a 59 year old man who sustained a traumatic blow to the head over a year ago. This incident has wiped the majority of his short term memory. He now suffers from seizures and concussions. This has destroyed a lot of his functioning life.  He has severe dizziness and lost most control of his sensory motor skills.

Dkt 219-2 at 5.

## C.    Legal Standard

HAL has a high hurdle to overcome in its quest to set aside the verdict in this case. Even in criminal cases, courts are not eager to reopen litigation based on a witness stating he or she lied earlier in the proceeding: "[R]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts." *United States v. Adi,* 759 F.2d 404, 408 (5th Cir.1985); *see also United States ex rel. Jones v DeRobertis,* 766 F.2d 270 at 272 (7th Cir. 1985) ("Courts treat recantations and claims of perjury with great skepticism even under the best of circumstances"); *United States v. Krasny,* 607 F.2d 840 (9th Cir.1979), *cert. denied,* 445 U.S. 942 (1980).   Here, of course, Ms. Mizeur was never a testifying witness, and stops short of saying she lied to HAL in informal interviews before trial, saying only that she "withheld information."

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 3 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

**Rule 59 standards.** "Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the [Rule 59] motion." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011), quoting *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir.1999) (en banc) (per curiam) (internal quotation marks omitted). "But amending a judgment after its entry remains 'an extraordinary remedy which should be used sparingly.'" *Id.*, quoting *McDowell*, 197 F.3d 1253, 1255 fn.1 (9th Cir. 1999).

> In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law.

*Id.*

**Rule 60 standards.** "To prevail, the moving party must prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct and the conduct complained of prevented the losing party from fully and fairly presenting the defense." *De Saracho v. Custom Food Machinery, Inc.*, 206 F.3d 874, 880 (9th Cir. 2000). "Rule 60(b)(3) 'is aimed at judgments which were unfairly obtained, not at those which are factually incorrect.'" *Id.*, quoting *In re M/V Peacock*, 809 F.2d 1403, 1405 (9th Cir. 1987). Rule 60(b)(3) also "require[s] that fraud ... not be discoverable by due diligence before or during the proceedings." *Casey v. Albertson's, Inc.*, 362 F.3d 1254, 1260 (9th Cir. 2004), quoting *Pac. & Arctic Ry. and Navigation Co. v. United Transp. Union*, 952 F.2d 1144, 1148 (9th Cir. 1991).

The phrase "fraud on the court" "should be read narrowly, in the interest of preserving the finality of judgments." *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999), quoting *Toscano v. Commissioner*, 441 F.2d 930, 934 (9th Cir. 1971).

> Simply put, not all fraud is fraud on the court. To constitute fraud on the court, the alleged misconduct must "harm[ ] the integrity of the judicial process." *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989). To determine whether there has been fraud on the court, this circuit and others apply Professor Moore's definition:
>
> > "Fraud upon the court" should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual

**FRIEDMAN | RUBIN**®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

manner its impartial task of adjudging cases that are presented for adjudication.

*Id.*, quoting *Gumport v. China International Trust and Inv. Corp.* (*In re Intermagnetics America, Inc.*), 926 F.2d 912, 916 (9th Cir. 1991) (quoting 7 James Wm. Moore et al., Moore's Federal Practice ¶ 60.33, at 515 (2d ed. 1978)). "Generally, non-disclosure by itself does not constitute fraud on the court." *Id.* "Similarly, perjury by a party or witness, by itself, is not normally fraud on the court." Because "perjury is an evil that could and should be exposed at trial, it should not qualify as fraud upon the court." *Id.*, at 1120, citing *Gleason v. Jandrucko*, 860 F.2d 556, 560 (2d Cir. 1988). "Fraud on the court requires a 'grave miscarriage of justice … and a fraud that is aimed at the court." *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 780 (9th Cir. 2003).

> By definition, lack of access to *any* discoverable material forecloses "full" preparation for trial since the material in question will be missing. <u>Yet concealed evidence may turn out to be cumulative, insignificant, or of marginal relevance</u>. If that be the case, retrial would needlessly squander judicial resources. The solution, we believe, is that before retrial is mandated under Rule 60(b)(3) in consequence of discovery misconduct, the challenged behavior must *substantially* have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial.

*Anderson v. Cryovac, Inc.,* 862 F.2d 910, 924-25 (1st Cir. 1988) <u>aff'd</u>, 900 F.2d 388 (1st Cir. 1990) (court's italics, underline emphasis added)

To prevail on a "newly discovered evidence" claim under Rule 60(b)(2), a party must establish "(1) the evidence was discovered after trial; (2) due diligence was exercised to discover the evidence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence is such that a new trial would probably produce a different result." *In re Levaquin Products Liab. Litig.*, 739 F.3d 401, 404 (8th Cir. 2014).

### D.    Mizuer's Background, Bias, and Credibility

A trial court may reject even uncontradicted testimony "because of its inherent unbelievability, because a witness's demeanor raises doubt as to his sincerity, or because the testimony is clouded with uncertainty." *Jauregui v. City of Glendale*, 852 F.2d 1128 (9th Cir. 1988) (quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 n. 8 (9th Cir.1985)); *see also United States v. DeRobertis*, 766 F.2d 270, 273 (7th Cir.1985), cert. denied, 475 U.S. 1053 (1986) (a judge may disbelieve uncontradicted testimony without giving any reason).

**FRIEDMAN | RUBIN**®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

Amy Mizeur was an employee of Illinois Armored Transport, Inc., a company affiliated with The Gold Center. She was terminated on April 3, 2015 for theft. Wagoner Decl., ¶ 4. She blamed Mr. Hausman for that termination and tried to extort money from him to keep her quiet. Mr. Hausman refused to pay her hush money, and she has now done as she threatened to do and contacted HAL with her allegations in an effort to "ruin" his life and his family.

People who know her reputation for truthfulness (Fed.R.Evid. 608(a)) describe her reputation for honesty as "extremely poor." (Waiscott Decl., ¶ 8, Fieldbinder Decl., ¶ 8, Tucker Decl., ¶ 9, Garrett Decl., ¶ 8 and Chandler Decl., ¶ 8)

### E.     The Mizeur Declaration

The current motion relies entirely on the allegations in Ms. Mizeur's declaration. A paragraph-by-paragraph analysis of Ms. Mizeur's declaration establishes that there is nothing in her allegations–individually or collectively–that requires setting aside the jury's verdict. The allegations are either irrelevant, untrue, misleading, or some combination of those traits.

1.     This paragraph is merely introductory.

2.     This paragraph states the dates she worked at The Gold Center and her role there. It neglects to mention, however, that Ms. Mizeur was terminated following revelations that she took a check from Mr. Hausman's checkbook, made it out to herself for $2,000, and forged his signature. *See* Gilliam Decl., ¶¶ 15-16, Wagoner Decl., ¶ 6.

3.     This paragraph is unremarkable, but does exaggerate the contact she had with Mr. Hausman. *See* J. Hausman Decl. ¶6, Exh. 3. Rather than work 8 to 12 hour days, Ms. Mizeur was actually working 30 to 40 hours per week. In addition, it neglects to make clear that Ms. Mizeur was no longer Mr. Hausman's personal assistant at the time of the Court's order regarding his emails. J. Hausman Decl., ¶ 6. In August of 2013, which was after the sale of The Gold Center, Ms. Mizeur was transferred to a position as a buyer, and moved to the front desk area of the Gold Center. J. Hausman Decl., Exh. 4.

4.     Hausman does not dispute that Ms. Mizeur was aware of the Holland America lawsuit.

5.     This paragraph contains no information that is new, improper, or that would be material. It is not, however, completely accurate. As Mr. Hausman states:

**FRIEDMAN | RUBIN®**
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

> While it is true I did computer research concerning my court cases from time to time, it is not true that I attempted to contact other passengers who had been injured by automatic doors on HAL ships. My lawyers were responsible for preparing the case for trial and finding and interviewing witnesses.

J. Hausman Decl., ¶ 7.

6.     This allegation is denied. Mr. Hausman states he told all employees, including Ms. Mizeur, to cooperate with the defense interviews and answer questions truthfully. J. Hausman Decl., ¶¶ 8, 9.  Other Gold Center employees corroborate that fact. Fieldbinder  Decl.,  ¶ 5, Tucker Decl., ¶ 6, Waiscott Decl., ¶ 5, Chandler Decl., ¶ 5, Garrett Decl., ¶ 5.

7.     The allegations in this paragraph are denied and in dispute.  Ms. Mizeur alleges that Mr. Hausman was "very concerned that the Gold Center employees being interviewed by HAL's attorneys were going to undermine or damage his lawsuit…."  Yet no other Gold Center employee has corroborated this allegation and, in fact, many (including Mizeur) were disclosed *by Hausman* in this litigation.  For example, five Gold Center employees were disclosed by Hausman in his Initial Disclosure pursuant to Rule 26 in August of 2013. Friedman Decl., ¶ 3, Exh. 1.  Mr. Hausman told his employees to cooperate with defense interviews and answer questions truthfully.  Fieldbinder Decl.,  ¶ 5, Tucker Decl., ¶ 6, Waiscott Decl., ¶ 5, Chandler Decl., ¶ 5, Garrett Decl., ¶ 5.  In any event, HAL had unfettered access to any Gold Center employee it wished to interview. The defense presented two such witnesses at trial: Mr. Green and Mr. Wagoner, neither of whom alleged any witness tampering by Mr. Hausman.

8.     This allegation is disputed.  *See* J. Hausman Decl., ¶ 10.  Even if true, however, nothing about this allegation constitutes a rule violation or other misconduct. If conversations with employees could be overheard, there would be nothing wrong with Mr. Hausman asking Ms. Mizeur to pay attention and report back to him what she heard.  Mr. Hausman certainly would not be entitled to a new trial if he learned post trial that some of the crew of the ms Amsterdam had discussed what each was asked during their depositions.

9.     There is nothing improper alleged in this paragraph.

10.     The allegations in this paragraph are denied.  *See* J. Hausman Decl., ¶ 11.  It would make no sense for Mr. Hausman to "order" Ms. Mizeur "not to tell the interviewers that he had

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 7 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

moved out of his house and was living by himself at local hotels" when Mr. Hausman, himself, disclosed this fact in his deposition.  *See* Friedman Decl., Exh. 2 (J. Hausman Depo., p. 6).   Mrs. Hausman also testified about that fact.  *See* Friedman Decl., Exh. 3 (C. Hausman Depo., p. 5). In addition, Hausman obtained documents related to his Springfield hotel stays and provided them to HAL in his 2nd Supplemental Responses to Defendants Fourth Set of Interrogatories and Requests for Production, dated July 9, 2014.  *See* Friedman Decl., Exh. 4 (PLA 0000358-368 and PLA 000369-376).  It is hard to make an argument that Ms. Mizeur's "concealment" of that fact in a pre-trial phone conversation materially affected the trial when HAL already knew about it.

Ms. Mizeur further alleges that she delivered "cases of beer" to the hotels "so that such purchases would not show up on the hotel receipts."  For this to be true, a jury would have to believe that when Mr. Hausman checked into the hotels in April and March of 2014, he knew he would be asked about it later at his deposition, and knew that HAL would ask for the room service receipts in discovery.  Although both those things happened, Mr. Hausman had no reason to think that would be an issue that would later become relevant in this litigation.  Actually, however, Hausman took no effort to "conceal" beer orders from his hotel records, and produced to HAL room service receipts showing orders for Miller Lite. (*Id.*, at PLA000376, PLA000375).  In addition, Mr. Fieldbinder visited Hausman at one hotel and did not observe "cases of beer" in the room.  Fieldbinder Decl., ¶ 16. Finally, there is nothing particularly incriminating about asking someone to deliver beer, even if it happened.  There is no dispute that Mr. Hausman drinks beer.  If HAL called Ms. Mizeur as a witness at trial to state she delivered beer to his hotel, it is not a fact that would have changed anyone's understanding of his drinking habits.

11.     The allegation that Mr. Hausman consumed 24 cans of beer per day is disputed.  HAL conducted discovery on this issue and Mr. Hausman's alcohol consumption was fully litigated at trial. No witness, however, estimated his consumption at that high a level. For example, Mr. Hausman testified at his deposition that "at meetings at my office with people, I might have six or eight beers." Friedman Decl., Exh. 2 (J. Hausman Depo., p. 96).  He also testified on some occasions, "we might stay there until midnight.  And you know, 12, 14 beers in a night, you know.  Something like that." *Id.* At trial Christel Mensink testified she never noticed Mr. Hausman intoxicated onboard the ship.

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 8 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

"Very happy, but not intoxicated."  Friedman Decl., Exh. 5 (Trial Tr., Day 6, p. 200).  Hank Mensink and Captain Everson also said they never saw Mr. Hausman appear intoxicated.  Friedman Decl., Exhs. 6 and 7 (Trial Tr., Day 6, p. 156 (Everson) and p. 217 (H. Mensink)).  Pat Newman testified at trial that he never saw Mr. Hausman drink to the point of obvious intoxication. Friedman Decl., Exh. 8 (Trial Tr., Day 3, p. 205).  Mr. Fieldbinder testified as follows:

> Q We have heard a lot about the fact that he drinks Miller Lite.
> A Uh-huh.
> Q Have you ever seen his drinking interfere with business relationships in any way?
> A No. No.
> Q Or business performance?
> A No. Never.
> Q How about social relationships?
> A As far as his drinking interfering with it?
> Q Yeah. Yeah.
> A No.

Friedman Decl., Exh. 9 (Trial Tr., Day 3, p. 237-38).

According to what Ms. Mizeur stated to plaintiff's investigator, the HAL interviewer did not ask her *any* questions about Mr. Hausman's drinking habits. (Wood Decl., ¶ 9).  Other employees who were interviewed by HAL also do not recall being asked specifics about Hausman's drinking habits.  Fieldbinder Decl., ¶ 6, Waiscott Decl., ¶ 6, and Garrett Decl., ¶ 6.

In light of all the testimony on this subject by a variety of individuals, if HAL had offered testimony of Ms. Mizeur stating that Mr. Hausman drank approximately 24 cans of beer per day, it is unlikely to have changed the result at trial.  This is particularly true in light of the severe credibility issues Ms. Mizeur would face in front of a jury.  Regardless, HAL cannot claim prejudice or assert there was a miscarriage of justice if it never asked Mizeur questions about Mr. Hausman's drinking.

12.     The allegations in this paragraph are disputed.  There is no evidence that Ms. Mizeur actually responded to questions as she alleges Mr. Hausman suggested.  Rather than state things like "It's hard to keep track," or "I'm not sure," she told plaintiff's investigator that she would observe Mr. Hausman drink 4 to 6 beers, and on occasion would get drunk at the office.  (Wood Decl., ¶ 5).  If she testified at trial that he drank approximately 24 cans of beer per day, she would have been impeached not only by the testimony of all other witnesses, but also her statement to Ms. Wood.

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 9 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

Moreover, even if true, HAL made a tactical decision not to ask Ms. Mizeur how much Hausman drank, not to depose her, and not to call her as a witness at trial.

13.     The allegations in this paragraph are disputed.  J. Hausman Decl., ¶13.  Ms. Mizeur told plaintiff's investigator that she was interviewed by HAL on November 5, 2014.  She said the conversation lasted approximately 20 minutes and the "woman was nice and friendly."  According to Ms. Mizeur, the questions were generally about how Mr. Hausman was now versus before, and she was not asked about Hausman's drinking.  (Wood Decl., ¶ 9).

14.     The allegations in this paragraph are disputed.  Kristina Wood first spoke to Ms. Mizeur on September 18, 2014. At that time, an interview with defense was not contemplated and was not discussed.  Ms. Wood next spoke with Ms. Mizeur on September 24, 2014, after several Gold Center employees were interviewed by HAL.  Ms. Mizeur indicated she would be interviewed in the future, but did not ask, and was not told, how to respond to questions. (Wood Decl., ¶¶ 6, 7). Moreover, the advice Ms. Wood was alleged to have given would not be misconduct.

15.     The allegations in this paragraph are disputed.  No such statement by Ms. Mizeur was given to, or relied upon, by Dr. Fortin.  Fortin Decl., ¶ 4, J. Hausman Decl., ¶ 14.  Nor does the statement appear in any of the medical records in this case.  Friedman Decl., ¶ 12.  If Ms. Mizeur did prepare and sign such a statement, there is no conceivable prejudice to defendants since it was never provided to Dr. Fortin, or relied upon by any medical professional.

16.     Plaintiff does not dispute he gave a bottle of wine to Dr. Fortin, or that he has given wine to other individuals on occasion.  He does, however, dispute that he had any improper motives or that he said "I hope we can get Dr. Fortin to be our expert witness."  Dr. Fortin was disclosed as a witness in this case in Plaintiff's Initial Disclosures (8/30/2013), before Ms. Mizeur even worked at The Gold Center.  Dr. Fortin's records were also disclosed at that time.  Friedman Decl., Exh. 1.  The gift of wine had no impact on Dr. Fortin's opinions.  Fortin Decl., ¶ 5.

17.     The allegations in this paragraph are disputed.  *See* J. Hausman Decl., ¶ 16:

> I was initially upset that HAL was seeking all of my personal and professional emails. I thought that would be an invasion of my privacy and the privacy of many of our customers (including sensitive financial information).  When the scope of the email production was limited by the Court, I was comfortable with the compromise and had no objection to my emails being searched for the terms as ordered by the Court.  While

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 10 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

some emails were probably helpful to my case, I knew that other emails would be used by HAL to try to undermine my case (as they did at trial).  I was willing to let the chips fall where they may and never deleted any emails in an effort to violate the court's order.

In any event, Hausman provided his user name and password to an independent third-party hired by his attorney to allow access to his accounts and over 14,200 Hotmail emails and over 25,100 Yahoo emails were captured and searched for production to the defense. Friedman Decl., ¶ 13.  After running the required searches, 13,944 pages of emails were produced to the defense (Bates numbers HAUSMAN.E00001 TO HAUSMAN.E013944).  *Id.*  That is hardly a "**limited number of emails**" as alleged in defendants' motion (Dkt 216, at 5:3).  HAL is also mistaken when it claims that "suspiciously, every email Plaintiff produced in this litigation was from his Hotmail email account." Dkt 216, at 5:16-17).  *See*, for example HAUSMAN.E013577, E013550, and E013566 as just three of many examples from thegoldcenter@yahoo.com.  Friedman Decl., ¶ 15, Exh. 10.

18.     The allegations in this paragraph are disputed.  This never happened.  J. Hausman Decl., ¶17.  In addition, there would be no reason for Mr. Hausman to "order" Ms. Mizeur to delete emails from her computer, as the Court's order only required a search of Mr. Hausman's accounts, not hers.  And, of course, neither party ever requested Ms. Mizeur's emails in this litigation, so deleting emails from her computer, if it occurred, could not have affected the trial.

19.     None of the emails attached as Exh. 1 to Ms. Mizeur declaration establish a "miscarriage of justice" or an intentional violation of the discovery rules or Court's order.

First, these are hardly "smoking gun" type emails nor interesting enough for Mr. Hausman to save in his inbox or sent email folders.  *See* J. Hausman Decl., ¶ 18, explaining that he "would typically save the emails that had business or personal significance and delete others and junk emails as they came in," and periodically clear his trash folder. These emails may have been routinely deleted.

Second, several of these emails (Dkt 219-1, at 2, 3) contain no search terms, and so would not have been produced in discovery even if they had been retained. This includes the email about climbing on the ladder.

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 11 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

Third, one email (Dkt 219-1, at 5) where Mr. Hausman states "bad seizures last night before bed" should have been produced in discovery if it was not routinely deleted.  If it was not, it was inadvertent and beyond Mr. Hausman's control.  As explained above, the downloading of emails and filtering with the search terms was done by independent third-party consultants. Mr. Hausman, obviously, would have no incentive to remove an email recounting a "bad seizure" experience from the emails he disclosed.  And, disclosure of this email would not have changed the outcome at trial.

Fourth, any "duty to retain" these emails commenced at the earliest on March 28, 2014, and the latest on December 31, 2014.  Many of these emails were written before March 28, 2014 and all of them before January 1, 2015, and therefore routine deletion of any emails as they came in, according to Hausman's normal practice, would not be a discovery violation or otherwise improper.

The *first* request for Hausman's email in this litigation was served on March 28, 2014, ten months after the Complaint was filed. Friedman Decl., ¶ 16, Exh. 11. That request, seeking *all* emails, was facially overbroad.  On May 2, 2014 (after an agreed extension for response), Hausman objected to Request for Production No. 27.  Dkt 218-1, at 6-7. He provided specific reasons for the objection, including the number of emails that probably existed, issues of confidentiality and privilege, the lack of relevance of any emails, and, citing *Ogden v. All State Career Sch.*, 2104 WL 1646934, plaintiff noted "Defendant is no more entitled to such unfettered access to plaintiff's personal email and social networking communications that it is to rummage through the desk drawers and closets in plaintiff's home."  Hausman did state:

> Notwithstanding such objections, Mr. Hausman is willing to consider a more narrowly tailored request.

Dkt 218-1, at 7:10.

HAL, however, made no effort to narrow its request or compel responses until October 28, 2014 when counsel wrote a letter asking for supplemental responses to several requests, including RFP 27.  Thus, from the time of plaintiff's objections until October 28, 2014, plaintiff reasonably thought the issue was resolved by his objection and that no emails needed to be produced or retained. Friedman Decl., ¶ 17.  Plaintiff stood by his objections, and Defendant, rather than move to compel, let the matter drop.  It was not until **December 31, 2014** that defendant served a new Request for

Production, No. 48, asking Hausman to produce only emails that contained particular search terms. *See* Dkt 218-2, at 6.  In response to that more limited request, Plaintiff agreed to produce all emails containing the terms "seizure," "headache," "dizzy," "dizziness," "vertigo," "holland," "HAL," "not the same," "bi-parting automatic door[s]," "automatic door[s]," "sensor[s]," "door/s injur!," and "door /s[fault OR broken OR damaged OR defective]." Friedman Decl., ¶ 18, Exh. 12. Hausman's attorneys then hired an independent third party to access Mr. Hausman's email accounts and download all of his existing emails in anticipation of a search.  That process began on January 26, 2015 and was finished by February 3, 2015.  Whitney Decl., ¶¶ 4, 5.  After the Court ruled on what search terms needed to be employed, the complete set of emails was sent to a different litigation support firm, Quivx, which conducted the actual search and identified privileged emails. Ultimately, Plaintiff produced over 13,000 pages of emails and a privilege log listing over 600 additional emails.

The fourth email (Dkt 219-1, at 5) is an email from Ms. Mizeur to Mr. Hausman.  If not routinely deleted it should have been produced because it contains the search term "HAL."  If it was not, it was inadvertent and beyond Mr. Hausman's control.  He would have had no incentive to delete this email, as there is nothing controversial about it.

The fifth email (Dkt 219-1, at 6) if not routinely deleted should have been produced because it contains the search term "Holland."  Mr. Hausman would also have had no incentive to delete this email, as there is nothing controversial about it either.

These emails are not "of such magnitude that production of it earlier would have been likely to change the disposition of the case." Like much of the evidence in this case, the emails were a "mixed bag."  Some bolster his case, since they are contemporaneous indications that Mr. Hausman was truly struggling with seizures, as he has always claimed.  On the other hand, one email suggests he used a ladder to clear ice and snow from his house one day.  This email contained none of the ordered search terms, and Mr. Hausman had no duty to turn this over to anyone.  In addition, Mr. Hausman did not testify at trial that he *never* climbed a ladder.  He stated it was difficult for him and he can't change light bulbs now.

Q: Why can't you change a light bulb?

A: The vertigo, getting up on a ladder, that I'm not supposed to get on a ladder. I'm not supposed to do anything mechanical, around machinery, stuff like that.

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 13 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

Q: Well, you are not supposed to drive either, right?

A: That's correct.

Q But you do that?

A: But I do that.

Q: So why not change a light bulb?

A: Afraid of falling and hurting myself again.

Friedman Decl., Exh.13 (Trial Tr., Day 3, at 270:10-19).

The fact that he did use a ladder one day even though he was not supposed to would not have changed the outcome at trial. He admitted, as shown above, that he did other things he was not supposed to do.

20.     The allegations in this paragraph are disputed. J. Hausman Decl., ¶ 18. There is no credible evidence that this occurred. In addition, it is alleged to have happened after Ms. Mizeur was transferred to general duties at the Gold Center and was no longer stationed in Mr. Hausman's office.

21.     The allegations in this paragraph are disputed. J. Hausman Decl., ¶ 19:

> I never discussed the possibility of hiring an outside vendor to "scrub" the computer as Ms. Mizeur alleges in paragraph 21 of her declaration. As I understood the way the email system worked, my emails were stored in email servers and there would be no record of them on my personal or business computers regardless of whether they were saved or deleted.

Although Ms. Mizeur alleges some improper activities were discussed, she does not state that anything improper was actually done. Plaintiff hired a professional third-party vender, Sigmund Technology Group, to attempt to recover deleted emails from Mr. Hausman's work and home computers. Walter Sigmund Decl., ¶ 1-12. Mr. Hausman answered all of his questions and cooperated fully in his investigation. *Id.*, at ¶ 13. Another independent third-party vendor was hired to download all of Mr. Hausman's emails. *See* Whitney Decl., ¶¶ 4-5; J. Hausman Decl., ¶ 20. In any event, more than 13,000 pages of emails were provided to defendants.

22.     The allegations and insinuations in this paragraph are disputed. J. Hausman Decl., ¶ 20; Avery Decl., ¶¶ 3, 7-9.

23.     The allegations about Mr. Hausman possessing emails going back as far as 2003 are irrelevant; the Request for Production of emails only asked for emails from January 2011 forward.

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 14 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

Dkt 218-5, at 2.  In addition, Ms. Mizeur is confusing different email accounts when she talks about searching old emails:

> The old emails that Ms. Mizeur is referring to in paragraph 23 of her declaration would be the Gold Center emails stored on the Gold Center server.  My personal emails were not saved on that server.

J. Hausman Decl., ¶ 21.

24.     Mr. Hausman did have an inactive Yahoo email account that Ms. Mizeur set up for him when she began working for the Gold Center.  J. Hausman Decl. ¶ 22.  It was used only a handful of times in December 2013, and probably was completely inactive from March 2014 forward.  *Id.*  Notably, however, Ms. Mizeur used that account to forward to Mr. Hausman an email exchange she had with the University of Wisconsin Neurorehabilitation Lab.  In that email, Ms. Mizeur stated the following:

> I am inquiring about this study on behalf of my employer.  He is a 59 year old man who sustained a traumatic blow to the head over a year ago.  This incident has wiped the majority of his short term memory.  He now suffers from seizures and conclusions.  This has destroyed a lot of his functioning life.  He has severe dizziness and lost most control of his sensory motor skills.

Dkt 219-2, at 5.

Mr. Hausman had no duty to retain these emails (all prior to the first request by Defendants for any emails) and there would have been nothing improper about routinely deleting any of them he felt no need to archive.

25.     There is nothing improper alleged in this paragraph, but it is not accurate.  J. Hausman Decl., ¶ 23:

> I did not have Ms. Mizeur read though the information and answers I was putting together to provide to my attorneys to make sure I was not saying anything that might damage my case.  I usually worked with Carol when I had to respond to questions from our attorneys.

26.     The allegations in this paragraph are disputed.  J. Hausman Decl., ¶ 24.  The inference here is that Mr. Hausman was researching seizures so he could fabricate having them.  If, in fact, Mr. Hausman watched internet videos "to see what seizures looked like," it would be expected that the

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 15 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

seizures he experienced would look like that.  In fact, Dr. Doherty explained at trial that the video clips of Mr. Hausman's seizures did not look like typical seizures at all.

> To get the tongue to move in and out of your mouth during an event requires your frontal lobe to tell your brainstem to move the tongue in and out during the event, which is a very coordinated movement, almost akin to speaking appropriately, meaning you shape your tongue to phonate and make words.  In this case he's moving his tongue in and out of his mouth in a manner that suggests that it's volitional or that he has control over that. <u>We don't see that kind of movement in epilepsy.</u>

Friedman Decl., Exh. 14 (Trial Tr., Day 7, p. 202) (emphasis added).

> We typically see uncoordinated shaking, or alternatively tonic posturing, where it's stiff, and the strongest muscles are overpowering the weakest. Not seeing that in this case.

*Id.*, p. 203.

> Would you see any of that in a convulsive or real seizure? No, you wouldn't. You'd see him fall off the chair. There would be no passage of the napkin from one hand to the other. The guy would be on the ground. He'd be stiff and lose consciousness. <u>This is not what we'd see in seizure activity.</u>

*Id.*, p. 204 (emphasis added)

> So, is there tongue thrusting? No. Is there passage of a tissue from one hand to the other? No. Is there eyes open like most of the other events? No. This time they're closed. Just another manifestation of a different flavor of behavior. <u>None of it is stereotyped. In epilepsy, from posttraumatic epilepsy, the seizure types typically we would see start in the same location where the maximum of damage occurred, spread from that location and consequently give you a very stereotyped event from start to finish.</u>

*Id.*, at 204-205.

Mr. Hausman's seizure experiences were fully explored at trial.

27.     There is nothing improper alleged in this paragraph. *See* J. Hausman Decl., ¶ 5.

28.     There is nothing improper alleged in this paragraph. It doesn't tell the whole story, however.  *See* J. Hausman Decl., ¶ 26, claiming that Ms. Mizeur "grossly misused" the credit card and he had to close the account as a result.   In addition, Hausman terminated the card and unsuccessfully tried to keep Mizeur from using it after August 18, 2014.  *See* Kincaid Decl., ¶ 6.  This was long before Ms. Mizeur attempted her scheme to "ruin" him, and undercuts the insinuation in

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 16 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

1   HAL's motion, Dkt 216 at 10 n. 3, that the credit card was to reward Ms. Mizeur for her assistance in

2   some improper plan.

3        29.    It is unclear what is being alleged in this paragraph.  Neither Ms. Mizeur nor Mr.

4   Hausman were involved in culling through medical records before they were produced to HAL.  *See*

5   J. Hausman Decl., ¶ 27.  Mr. Hausman provided releases to HAL's attorneys and his attorneys so that

6   all records could be provided directly from the providers' offices to HAL's attorneys, or from the

7   providers to Hausman's attorneys. Friedman Decl. ¶ 21, Exh. 15 (47 pages of medical authorizations

8   and medical records requests by the attorneys in this case).  There is no evidence that *any* medical

9   records were withheld during discovery in this case and Ms. Mizeur does not allege differently.

10       30.    This paragraph is accurate.  *See* J. Hausman Decl., ¶ 28.

11       31.    The allegation in paragraph 31 is not anything improper, as implied by Defendants.

12       Dr. Fortin told me that the point of this device was to see what my brain waves were
13       like during a seizure, and that I should engage in any behavior I thought might
         "trigger" a seizure. I recall that Carol and I "purposefully fought," to trigger a seizure,
14       as Dr. Fortin had asked.  It did not, however, trigger a seizure.

15    J. Hausman Decl., ¶ 29. [THERE IS NO REFERENCE TO HAUSMAN ¶ 30.]

16       Dr. Fortin agrees:

17       Part of my ordinary practice with patients who are undergoing an EEG is to suggest to
18       the patient that he or she simulate events that they believe trigger seizures during the
         EEG.  In this way a seizure can be captured during the test.
19

20    Fortin Decl., ¶ 6.

21       32.    Plaintiff disputes the allegations that "Mr. Hausman did not want people to know that

22   he was able to drive that lengthy distance without difficulty."  Mr. Hausman was asked at his first

23   deposition "what's the longest distance you drive [since the incident]?"  He replied that he had driven

24   550 miles to his Hayward, Wisconsin home.  Friedman Decl., Exh. 2 (J. Hausman Depo., p. 78).  At

25   his second deposition, he also admitted driving to Hayward. *Id.*, Exh. 16 (J. Hausman Depo Vol. II,

26   p. 196).  Contrary to Ms. Mizeur's allegations, the fact that Mr. Hausman has driven to Wisconsin

27   was never a secret.  Mr. Shields even wove it into his closing argument:

28       Where is the life-changing injuries that we've been hearing about? If you have
         seizures, are you going to drive 550 miles to your cabin in Wisconsin?

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 17 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

Friedman Decl., Exh. 17 (Trial Tr., Day 8, p. 71:12-17).

Thus, nothing would have been different at trial if Defendants had called Ms. Mizeur as a witness to testify that Mr. Hausman drove to Hayward, Wisconsin.

33.     The allegations in this paragraph about Mr. Hausman driving long distances without difficulty are denied.  J. Hausman Decl., ¶ 31.

34.     The allegations in paragraph 34 are denied.  *See* J. Hausman Decl., ¶ 32:

I may have assisted her into our boat one time. The boat, however, is stored on an electric boat lift and is very stable until lowered into the water. People generally board the boat before it has been totally lowered into the water. I did not walk around "rocky beaches" and I only used the boat when the lake was very calm. I testified about boating in Wisconsin in my deposition, pages 129-131.

Mr. Hausman did testify about boating in Wisconsin during his deposition:

Q   You said you've gone boating a dozen times?
A   Probably.
Q   When was the last time you went boating?
A   Last fall, before we closed up, pulled the boats out.
Q   And prior to the cruise, how often would you go?
A   Every day.  5:00 o'clock, 4:00 o'clock.
Q   And how has boating changed for you now?
A    That I can't speed, I only feel safe -- I call it toodling.  Idle, you know. That -- and then I have to have that dead man switch tied to me that, you can't move around in the boat, stuff like that.
Q   And you don't go faster because -- why?
A   I don't think I can handle it.

Friedman Decl., Exh. 2 (Hausman Depo., pp. 130-131).

Another witness confirms this.  Mike Bulgin takes care of the Hausman Wisconsin home, and has observed Mr. Hausman in and around his boat:

During the time that I have worked for Mr. Hausman, I have observed him in and around his boat on several occasions before and after his accident on the HAL cruise. I have noted that Mr. Hausman is much more cautious and drives his boat more slowly on the lake than he previously did.  I have observed that he struggles with his balance on the boat and when he gets back on the dock, it takes him some time to regain his balance on land.

Bulgrin Decl., ¶ 6.

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

35.     Ms. Mizeur alleges in this paragraph that Mr. Hausman did not show any signs of physical or mental impairment when she observed him away from the office.  In reality, however, she not only summarized his problems in an email to the University of Wisconsin (*see* ¶ 24, *infra*), but she wrote numerous emails to Mrs. Hausman documenting Mr. Hausman's problems.  On July 25, 2014, for example, she wrote:

> The seizure last night lasted 5-10 minutes at the most.  He got the blank look on his face, eyes started to water and pointed to the drawer where the pills are and opened his mouth.  I put 2 in his mouth as he had then started to pound his wrists on the table.  Of that was maybe 2-3 minutes then the shaking stopped with Id say 4-5 minutes at the most.  It was not a very bad one other than the few minutes he began to pound on the table.  I grabbed his wrists and tried to steady the shaking and pushed him back in the chair so he didn't fall off because he had started to get to the edge of the seat. He snapped out of it pretty quick.  I would say 10 minutes total from start to finish.

C. Hausman Declaration, Exh. 1.

Ms. Mizeur also wrote that things like:

- "All I'm doing is trying to help him when I can bcuz his memory fails him."

- "I take great pride in helping him recall things he cannot and remind him of the things he forgets and ask him to take a breath when I see mhim getting worked up about things I don't think his health can afford."

- "I just see now he struggles more than I ever knew and I want to help to make it easier for all of u and tell u when I think he is not ok wo u getting upset w me."

C. Hausman Decl., Exh. 2 (11/15/13 email from A. Mizeur to C. Hausman).

36.     While Mr. Hausman would occasionally help unload cases of coins, they weigh under 41 pounds each.  J. Hausman Decl., ¶ 41.  Hausman never claimed to be unable to lift 41 pounds. Mr. Hausman denies spending up to 10 hours "re-arranging all the items in the vault. *Id*. That allegation, however, is also immaterial to the disputed issues at trial.  J. Hausman Decl., ¶ 34.

37.     Hausman did climb some pull-down stairs (with handrails) on one occasion to retrieve an item from the storage area in his Hayward guest house. J. Hausman Decl., ¶ 35.  He never climbed ladders to get up on the roof to address snow and ice concerns.  *Id*. Mr. Bulgrin also never observed such conduct:

> During the time that that I have worked for Mr. Hausman, I have never seen him on a ladder after the accident.  In fact, cleaning the gutters and removing ice and snow from

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 19 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

the roof is my job.  I have seen him use a step stool to clean the boat, but I have never seen him on a ladder.

Bulgrin Decl., ¶ 7,

38.     The allegations in this paragraph are disputed.  J. Hausman Decl., ¶ 36.

Living on the Hayward property, I'm familiar with the process of putting in and removing the boat from the water. Mr. Hausman has his own private landing, and it is very nice.  Hooking up the boat to the trailer is a very simple maneuver that most anyone can do.  The boat only needs to be moved approximately 50 yards from the water to the garage.

Bulgrin Decl., ¶ 8.

39.     This paragraph about security cameras in Hayward is accurate, but never disputed or denied in discovery or at trial.  J. Hausman Decl., ¶ 37.

40.     This paragraph about the security system at the Gold Center is accurate, but never disputed or denied in discovery or at trial.  In fact, during his deposition the following exchange took place:

Q    And does The Gold Center have a surveillance camera?
A    Lots of them.
Q    Why?
A    The Gold Center is a high security facility that has a lot of assets that a lot of bad people would like to get.
Q    And how long is the footage contained?
A    Usually it saves it for 30 to 90 days; depending on which system.

Friedman Decl., Exh. 2 (J. Hausman Depo., p. 123-124); J. Hausman Decl., ¶ 38.

41.     The shelving that was loaded on to the Lincoln Navigator was placed there with a fork lift, not by Jim Hausman.  J. Hausman Decl., ¶ 39.  Chandler decl., ¶ 13.  He had assistance in Hayward unloading the shelving. J. Hausman Decl., at ¶ 40.  Mr. Bulgrin does not recall how Mr. Hausman unloaded the shelving, but does not believe he could have done it without assistance:

I do not recollect helping Mr. Hausman remove the pallet rack from his Navigator. However, I do know that the pallet rack is very heavy and doubt that we would be able to do it himself.  If he did attempt to do so, it is likely that he would have scratched his car.  I recall the pallet rack laying on the side of the driveway, and I put it together for him.

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 20 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

Bulgrin Decl., ¶ 9.

42.    As can be seen from the photograph, it was not necessary to climb up into the opened door of the vehicle to reach the straps holding the shelving, and Mr. Hausman did not do so. J. Hausman Decl., ¶ 40.

43.    This paragraph is generally accurate.  Mr. Hausman did make deliveries to St. Louis and Chicago.  The cases of coins, however, weighed less than 41 pounds and were simply moved from the back of the vehicle onto a dolly.  J. Hausman Decl., ¶ 41.

44.    It is true that Mr. Hausman bought Ms. Mizeur a gun for her birthday.  ***This does not,*** however, mean, as alleged, that "Mr. Hausman testified falsely in his deposition about his gun shooting when he testified that since the accident he had never shot guns with anyone other than Steve."  Dkt 216, at 10 fn 4.  Mr. Hausman's deposition was April 14, 2014.  Ms. Mizeur's birthday was September 1, 2014, four and one half months *later.*  The gun was purchased on August 29, 2014. J. Hausman Decl., ¶ 42, Exh. 5. Thus, the one example HAL raises to establish Ms. Mizeur would have been a "crucial witness at trial" is actually simply a mistake by HAL about the timing of certain events.

45.    The allegations in this paragraph are denied.  J. Hausman Decl., ¶ 43.

It would be helpful to know which, if any, of the paragraphs above, the Court would like to hear live testimony on. This will help focus the issues, and reduce the number of witnesses and hearing time required.

### F.    Argument

As will be more fully established at the hearing on this issue, Ms. Mizeur has offered no credible evidence of any misconduct justifying setting aside the jury's verdict in this case. As noted above, relief under Rule 60(b) is extraordinary and may only be granted in "exceptional circumstances." *Ackermann v. United States,* 340 U.S. 193, 199 (1950). Parties seeking relief under Rule 60(b) have a higher hurdle to overcome because such a motion is not a substitute for an appeal. *Bud Brooks Trucking, Inc., v. Bill Hodges Trucking Co., Inc.*, 909 F.2d 1437, 1440 (10th Cir. 1990). The burden of establishing fraud is on the movant, and relief from a judgment under this rule may be granted only when an application is clearly substantiated by adequate, convincing proof. *See, e.g.*,

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 21 of 25

**FRIEDMAN | RUBIN®**
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

*Jennings v. Hicklin*, 587 F.2d 946 (9th Cir., 1978); *Wilkin v. Sunbeam Corp*., 466 F.2d 714 (10th Cir., 1972), cert. den. 409 U.S. 1126, 93 S.Ct. 940, 35 L.Ed.2d 258 (1973*); DiVito v. Fidelity and Deposit Co. of Maryland*, 361 F.2d 936 (7th Cir., 1966).  *See also Geigel v. Sea Land Service, Inc.,* 44 F.R.D. 1 (D.P.R., 1968) (finality of judgments requires Rule 60(b) motions to be closely scrutinized).

The record of this litigation establishes that HAL had a full and fair opportunity to present its case to the jury.  HAL has produced no credible evidence of fraud, violation of any court order, or any conduct that was improper.  Certainly, the record does not establish that HAL has suffered a "manifest injustice."

The trial in this case involved two broad categories of disputes that were fully contested and litigated: 1) the culpability of the defendant for the accident that injured Mr. Hausman (including liability for punitive damages), and 2) the nature and extent of his injuries.

In the current motion, HAL makes three broad allegations against Mr. Hausman, to wit, 1) he willfully and systematically destroyed evidence after being ordered by this Court to preserve and produce it, 2) fabricated evidence with the intention that one of his treating physicians would rely upon it; and 3) tampered with at least one witness, including suborning perjury of a fact witness. Dkt 216, at 2:6-9.   None of these allegations have been, or can be, established.

1.      **Destroyed Evidence.**  As explained above, there is no credible evidence that any emails were deleted after the Court's order in this case.  Contrary to  her assertion, Ms. Mizeur no longer shared an office with Mr. Hausman when the Court's order was issued.  *Compare*, Dkt 66 (Order granting Motion to Compel dated 2/5/15) and Hausman Decl., Exh. 4 (transferring Mizeur to the front desk in August of 2014).  Prior to that time, Mr. Hausman (like many people) routinely deleted many non-significant emails from his account. Hausman Decl., ¶ 18. The Request for Production of these emails that was the subject of the Motion to Compel was not even served on Plaintiff until December 31, 2014. Friedman Decl. ¶ 24, and Hausman supplied his login information to a third-party vendor (Hausman Decl., ¶ 20) and the emails were downloaded in late January and early February 2015.  Whitney Decl., ¶ 4, 5.  Ms. Mizeur's allegations to the contrary are simply not credible.  Finally, the allegations about destroying a hard drive are bizarre, in light of the fact the

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

1   emails did not reside on Mr. Hausman's hard drive, and he knew it.   Avery Decl., ¶¶ 8, 9, and

2   Hausman Decl., ¶ 19

3       **2.      Fabricated Evidence for Treating Physicians.**   There are four acts related to this

4   allegation, Dkt 216, at 7.   First, that Mr. Hausman attempted to cause an EEG to register abnormal

5   brain activity by simulating a fight with his wife. This is refuted by Dr. Fortin's declaration, stating

6   that his ordinary practice is to suggest to patients that he or she simulate events that they believe

7   trigger seizures during the EEG.   "In this way a seizure can be captured during the test."   Fortin decl.,

8   ¶ 6.

9       HAL next alleges that Mr. Hausman compelled Ms. Mizeur to sign an inaccurate summary so

10  that he could provide it to Dr. Fortin.   The problem with this theory is that, as known to defendants,

11  no such document appears in Dr. Fortin's records, or any of Hausman's records produced in this case.

12  Additionally, Dr. Fortin states he did not rely on any written or verbal statements of Mr. Hausman's

13  friends, family, or coworkers, and he was "not aware of any statement written by someone by the

14  name of Amy Mizeur"  Fortin Decl., ¶ 4. (Dr. Fortin also denies, of course, being influenced by a gift

15  of a bottle of wine.  Fortin Decl. ¶ 5)

16      Third, HAL states Hausman "systematically had his staff review documents being produced

17  to Holland America to ensure nothing contained any mention of a medical problem that he had

18  related to a tick bite or the fact he had found a tick embedded in his skin."  Dkt 216 at 7:20-22.  The

19  problem with this theory, as HAL also knows, is that the medical records produced in this case did

20  not flow through the Gold Center offices.  Mr. Hausman provided releases to HAL's attorneys and

21  his own attorneys so that all records could be provided directly from the providers' offices to HAL's

22  attorneys, or from the providers to Hausman's attorneys.  Friedman Decl., ¶ 21, Exh. 15.  The Gold

23  Center employees would have never had an opportunity to review medical records prior to their

24  production.  In addition, Mr. Hausman never sought medical treatment for this "tick bite."  Hausman

25  Decl., ¶ 27.

26      Finally, HAL alleges Hausman "watched videos of people having legitimate seizures on the

27  internet to ensure he know [sic] what a seizure was supposed to look like."  Dkt 216 at 8:1-2.  This

28  contradicts the argument made by HAL at trial that his seizures did not look like legitimate seizures.

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 23 of 25

FRIEDMAN | RUBIN®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

3.  **Witness Tampering.**  HAL claims that "Plaintiff instructed his employees to lie about his drinking to conceal his alcoholism …and about his marital problems when they were interviewed by the defense." Dkt 216 at 8:3-5. No other Gold Center employee supports Ms. Mizeur's allegations about Mr. Hausman's behavior. They each state that Mr. Hausman told his employees to cooperate with defense interviews and answer questions truthfully. Fieldbinder Decl., ¶ 5, Tucker Decl., ¶ 6, Waiscott Decl., ¶ 5, Chandler Decl., ¶ 5, Garrett Decl., ¶ 5. Moreover, the specific behaviors she said should be withheld from HAL (such as staying in local hotels, and driving to Wisconsin) were things Mr. Hausman and other witnesses freely admitted during discovery in this case.

It is worth taking a moment to imagine what the trial of this case would have looked like, had HAL known of the "facts" stated in Ms. Mizeur's declaration, and presented her as a witness to state those "facts." HAL would have identified itself with a witness fired for theft and forgery, who had threatened to ruin Mr. Hausman's life and extort hush money. This witness would have been soundly impeached, both on her motives and on the substance of her testimony[1].  It is quite likely this would have resulted in a larger verdict for Mr. Hausman. There is no basis under Rule 59 or Rule 60 to modify the existing judgment. *See Venture Indus. Corp. v. Autoliv ASP, Inc.,* 457 F.3d 1322, 1329–31 (Fed.Cir. 2006) (denying a Rule 60(b) motion when defendant failed to show how new evidence would have produced a different result).

DATED this 30th day of November 2015.

/s/  Kenneth R. Friedman
Kenneth R. Friedman, WSBA #17148
Richard H. Friedman, WSBA #30626
William S. Cummings, WSBA #40082
David P. Roosa, WSBA #45266
Roger S. Davidheiser, WSBA #18638
FRIEDMAN | RUBIN
1126 Highland Avenue
Bremerton, WA  98337
Telephone:  (360) 782-4300
Facsimile:  (360) 782-4358
E-Mail:  rfriedman@friedmanrubin.com
          kfriedman@friedmanrubin.com
          wcummings@friedmanrubin.com

---

[1] At the hearing the Court will see even more reasons to doubt the credibility and testimony of Ms. Mizeur.

PLAINTIFF'S OPP. TO DEFS' MOTION TO VACATE AND FOR DISMISSAL
*Hausman v. Holland America Line-U.S.A., et al., Case No. 2:13-cv-00937-BJR*
Page 24 of 25

**FRIEDMAN | RUBIN**®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of November 2015, a copy of the foregoing document was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

Louis A. Shields, Esq.
Asia N. Wright, Esq.
Richard A. Nielsen, Esq.
Nielsen Shields, PLLC
1000 Second Avenue, Suite 1950
Seattle, WA 98104
Tel: 206-728-1300
las@nielsenshields.com

Herbert G. Farber, Esq.
The Farber Law Group
10655 NE 4th Street, Suite 312
P.O Box 69
Bellevue, WA 98009-0069
hgfarber@hgfarber.com

I also certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

_____/s/  Dana Watkins_____
Dana Watkins, Paralegal
Friedman | Rubin

Z:\Bremerton Cases\Hausman vs. HAL\PLED\DEF MTN TO VACATE & DISMISS - 11-20-15\PL OPP\DRAFTS\Opp to Mtn for dismissal Fraud - 11-30-15 - SERVED .doc

**FRIEDMAN | RUBIN**®
1126 Highland Avenue
Bremerton, Washington  98337
(360) 782-4300