1
2
3
4
5

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6
7
8
9
10
11

JAMES R. HAUSMAN,                    )
                                     )
            *Plaintiff*,              )        CASE NO.      CV13-0937 BJR
                                     )
        v.                           )
                                     )        ORDER VACATING JUDGMENT
                                     )        AND GRANTING A NEW TRIAL
HOLLAND AMERICA LINE-U.S.A.,          )
*et al*.                              )
                                     )
            *Defendants*.             )
_____)

12
13

## I.      INTRODUCTION

14
15
16
17
18
19
20
21
22
23
24

Defendants, Holland America Line-U.S.A. and other related corporate entities

(collectively "Defendants"), move to vacate the judgment entered in this case and to dismiss the

matter with prejudice. Dkt. No. 216. Alternatively, they request a new trial. Plaintiff opposes the

motion. Dkt. No. 240. Having considered the parties' submissions, testimony, and relevant legal

authority, the Court concludes that: (1) Defendants have established by clear and convincing

evidence that Plaintiff, James R. Hausman, engaged in discovery misconduct, and (2) the

misconduct substantially interfered with Defendants' ability to fully and fairly prepare for and

proceed to trial. Therefore, the Court will VACATE the judgment and ORDER a new trial. The

Court's reasoning follows.[1]

25

---

[1] The Court considered the following in reaching its decision: The Motion to Vacate, Dkt. No. 216; Plaintiff's Opposition to the Motion to Vacate, Dkt. No. 240; Defendants' Reply in support of the Motion to Vacate, Dkt. No. 261; Plaintiff's Post-Trial Brief, Dkt. No. 276; Defendants' Post-Trial Brief, Dkt. No. 277; Declaration of Amy Mizeur, Dkt. No. 219; Declaration of Mike Tucker in support of Plaintiff's Opposition, Dkt. No. 252; Declaration of

## II.    BACKGROUND

In 2011, Mr. Hausman embarked on an eight-month, around-the-world cruise operated by Holland America Line. Dkt. No. 24 at ¶¶ 3-5, 12. The first leg of the cruise was a ten-week expedition that began in Seattle, Washington, traveled to Russia, China, Southeast Asia, and the South Pacific Islands, before returning to Los Angeles, California. Mr. Hausman alleges that when the cruise ship was approaching Honolulu, Hawaii, an automatic sliding glass door on the ship improperly closed and struck his head. *Id*. at ¶¶ 15, 38. He claims that this incident resulted in a brain injury that causes him to have seizures, dizziness, forgetfulness, and loss of balance, among other ailments. *Id*. at ¶ 16.

Thereafter, in May 2013, Mr. Hausman filed a negligence action against Defendants, seeking compensation for his alleged injuries. The matter proceeded to a two-week jury trial in October 2015. At the conclusion of the trial, the jury rendered a verdict in favor of Mr. Hausman, awarding five million in compensatory damages and 16.5 million in punitive damages. Dkt. No. 201. Accordingly, this Court entered judgment for Plaintiff on November 4, 2015. Dkt. No. 207.

However, the matter did not end there. Approximately two weeks after the trial concluded, Defendants were approached by Mr. Hausman's former personal assistant, Amy Mizeur, who informed them that Mr. Hausman had deliberately sabotaged Defendants' pre-trial discovery efforts. Ms. Mizeur's allegations are numerous, but can be generally categorized as follows: (1) Mr. Hausman deleted and/or failed to disclose the existence of emails that he knew

Matt Garrett in support of Plaintiff's Opposition, Dkt. No. 248; Declaration of Kathy Kincaid in support of Plaintiff's Opposition, Dkt. No. 250; Declaration of Josh Wagoner in support of Plaintiff's Opposition, Dkt. No. 253; Declaration of Alan Avery in support of Plaintiff's Opposition, Dkt. No. 257; Declaration of Jeff Chandler in support of Plaintiff's Opposition, Dkt. No. 243; Declaration of Josh Fieldbinder in support of Plaintiff's Opposition, Dkt. No. 244; Declaration of Mike Bulgrin in support of Plaintiff's Opposition, Dkt. No. 242; Declaration of Josh Wagoner, Dkt. No. 262; Plaintiff's Evidentiary Hearing Exhibits Nos. P1 – P32 and P34 – P36; and Defendants' Evidentiary Hearing Exhibits A1 – A6.  In addition, the Court heard testimony from the following witnesses: Eric Blank, Amy Mizeur, Jeff Whitney, Walter Sigmund, John Gilliam, Mark Selvaggio, Steven Nash, Mark Vance, Mario Perino, Charles Gramlich, and Plaintiff James Hausman. Dkt. Nos. 272-273.

were relevant to this lawsuit, (2) he tampered with witness testimony, (3) he fabricated and/or exaggerated the extent of his alleged injuries, and (4) he testified falsely at trial. *See*, *generally*, Dkt. No. 219.

Thereafter, Defendants filed the instant Motion to Vacate Judgment and for Dismissal or, in the Alternative, Motion to Vacate Judgment and for a New Trial (hereinafter, "the Motion"). Dkt. No. 216. In support of the Motion, Defendants filed a declaration from Ms. Mizeur that details the specifics of her allegations. Dkt. No. 219. Defendants also produced copies of emails written by Mr. Hausman that allegedly Ms. Mizeur was able to recover after they had been deleted. After reviewing the Motion and supporting documents, the Court determined that an evidentiary hearing was warranted and one was held on December 10 -11, 2015. Prior to the hearing, the Court instructed the parties to focus on Ms. Mizeur's claim that Mr. Hausman had destroyed and/or failed to disclose emails responsive to Defendants' discovery requests. *See* Dkt. No. 265. Accordingly, this decision also primarily focuses on that allegation.

### III.   DISCUSSION

#### A.   The Standard of Review

Ultimately, it is the trial judge's responsibility to ensure that a party is not a victim of a miscarriage of justice. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (citing *Cheney v. Moler*, 285 F.2d 116, 118-19 (10th Cir. 1960) (stating that it is the duty of the trial judge to ensure that a just verdict is returned)). To that end, the Federal Rules of Civil Procedure authorize a trial judge to vacate a judgment and grant a new trial, either upon a party's motion or *sua sponte*. *Chen v. City of Medina*, No. C11-2179TSZ, 2013 WL 4511411, *4 (W.D. Wash. Aug. 23, 2013) (citing Fed. R. Civ. P. 59(a)(1)(A) & (d)); *see also Murphy*, 914 F.2d at 187.

### 1. Federal Rules of Civil Procedure 59 and 60(b)(3)

Here, Defendants move for relief pursuant to Federal Rules of Civil Procedure 59 and 60(b)(3).[2] When misconduct in discovery is alleged, courts apply the Rule 60(b)(3) standard for both Rule 59 and 60(b) motions. *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990). Rule 60(b)(3) permits a court to relieve a party of a final judgment obtained through "fraud ..., misrepresentation, or misconduct by an opposing party." Fed.R.Civ.P. 60(b)(3). To prevail under Rule 60(b)(3), the moving party must establish by clear and convincing evidence that a judgment was obtained by fraud, misrepresentation, or misconduct, and that the conduct complained of prevented the moving party from fully and fairly presenting the case. *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.,* 791 F.2d 1334, 1338 (9th Cir. 1986) (citing *Bunch v. United States*, 680 F.2d 1271, 1283 (9th Cir. 1982)). The rule is aimed at judgments that were unfairly obtained, not at those that are merely factually incorrect. *In re M/V Peacock on Complaint of Edwards*, 809 F.2d 1403, 1405 (9th Cir. 1987) (citing *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978)).

### a. Failure to Disclose or Produce Materials Requested in Discovery

In the context of discovery disputes, "['f]ailure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of [Rule 60(b)(3)].'" *Jones*, 921 F.2d at 879 (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988)). Rule 60(b)(3) "does not demand proof of nefarious intent or purpose as a prerequisite to redress.... [it]

---

[2] Defendants also move pursuant to Rule 60(b)(2), (60)(b)(6), and this Court's inherent power to vacate a judgment in the event of "fraud on the court." Ms. Mizeur's allegations are numerous and potentially implicate each of these areas of the law. However, as discussed above, the Court directed the parties to focus their arguments on Ms. Mizeur's assertion that Mr. Hausman deleted and/or failed to disclose emails that were responsive to Defendants' discovery requests. Accordingly, the Court will likewise limit its analysis to Rule 60(b)(3). *See*, *e.g*., *Jones v. Aero/Chem Corp*., 921 F.2d 875, 879 (9th Cir. 1990) (quoting *Anderson v. Cryovac, Inc*., 862 F.2d 910, 923 (1st Cir. 1988) ("Failure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of [Rule 60(b)(3)].").

can cover even accidental omissions." *Anderson*, 862 F.2d at 923, *see also United States v. One Douglas A-26B Aircraft*, 662 F.2d 1372, 1374-75 n. 6 (11th Cir. 1981) (to avoid redundancy, "misrepresentation" in Rule 60(b)(3) must encompass more than false statements made with the intent to deceive); *Bros, Inc. v. W.E. Grace Manuf. Co*., 351 F.2d 208, 211 (5th Cir.1965), *cert. denied*, 383 U.S. 936 (1966) (relief on the ground of "other misconduct" can be justified "whether there was evil, innocent or careless, [*sic*] purpose"). *But see*, *Jordan v. Paccar, Inc*., 97 F.3d 1452 (6th Cir. 1997) ("Rule 60(b)(3) suggests a requirement of some odious behavior on the part of the non-moving party. To interpret [the Rule] as permitting the moving party merely to demonstrate that the non-moving party made a non-reckless mistake is to ignore the text and context of the rule[.]").

> **b.** **Whether the Failure to Disclose or Produce Substantially Interfered with Moving Party's Ability to Fully and Fairly Prepare for Trial**

"[W]hen the case involves the withholding of information called for by discovery, the adverse party need not establish that the result in the case would be altered." *Jones*, 921 F.2d at 879 (citing *Bunch*, 680 F.2d at 1283). However, courts "do 'not lightly … disturb[]' a jury verdict returned after a trial on the merits." *West v. Bell Helicopter Textron, Inc*., 803 F.3d 56, 67 (1st Cir. 2015) (quoting *Anderson*, 862 F.2d at 924). In order to warrant such a drastic remedy, the moving party must demonstrate that the alleged discovery misconduct "*substantially*…interfered" with the "aggrieved party's ability fully and fairly to prepare for and proceed at trial." *West*, 803 F.3d at 67 (quoting *Anderson*, 862 F.2d at 924) (emphasis in original). "Substantial interference may be shown in at least two ways." *West*, 803 F.3d at 67. First, the moving party may establish that the discovery misconduct "precluded inquiry into a plausible theory of liability, denied it access to evidence that could well have been probative on

an important issue, or closed off a potentially fruitful avenue of direct or cross examination." *Id.* (quoting *Anderson*, 862 F.2d at 925 (noting that the moving party need not prove that the concealed material would likely have "turned the tide at trial")). Second, substantial interference may be established through "a presumption of interference." *West*, 803 F.3d at 67 (quoting *Anderson*, 862 F.2d at 925).

### c.      Presumption of Interference

In determining whether "a presumption of interference" is warranted, the court must consider the non-disclosing party's intent. *Anderson*, 862 F.2d at 925. Nondisclosure "comes in different shapes and sizes: it may be accidental or inadvertent, or considerably more blameworthy (though still short of fraud or outright misrepresentation)." *Id.* "Thus, 'where concealment was knowing and purposeful, it seems fair to presume that the suppressed evidence would have damaged the nondisclosing party.'" *West*, 803 F.3d at 67 (quoting *Anderson*, 862 F.2d at 925). "And '[i]t seems equally logical that where discovery material is deliberately suppressed, its absence can be presumed to have inhibited the unearthing of further admissible evidence adverse to the withholder, that is to have substantially interfered with the aggrieved party's trial preparation.'" *Id.* (quoting *Anderson*, 862 F.2d at 925). If the court determines that a presumption of interference is appropriate, the presumption is a rebuttable one. *Id.* (quoting *Anderson*, 862 F.2d at 925). To rebut the presumption, the nondisclosing party must adduce "clear and convincing evidence demonstrating that the withheld material was in fact inconsequential." *Id.* at 68 (quoting *Anderson*, 862 F.2d at 925).

6

## B.    Defendants' Allegations

Defendants make their presentation in support of the instant Motion through documents and witness testimony at the evidentiary hearing held before the Court on December 10-11, 2015. Defendants' position is as follows.

On March 28, 2014, Defendants served Mr. Hausman with a set of interrogatories and document requests. Evid. Hearing, Ex. P3. It included a request for copies of all of his personal and business emails from January 1, 2011 through present (*i.e.* March 28, 2014). *Id.* at Doc. Req. No. 27. Mr. Hausman objected to the request as overly-broad, among other reasons. Evid. Hearing, Ex. P4 at 5. In response to Mr. Hausman's objection, on December 31, 2014, Defendants sent a revised request for Mr. Hausman's emails, limiting the request to emails that contained certain words (*e.g.*, seizure, dizzy, Holland, sex, love, beer, and relationship). Evid. Hearing, Ex. P7 at Doc. Req. No. 46. Once again, Mr. Hausman baulked at producing his emails and the parties sought intervention from the Court. Thereafter, on February 5, 2015, this Court ordered Mr. Hausman to produce any personal or business emails that contained the following word or words: injury, cruise, lawsuit, sue, litigation, door, seizure[s], headache[s], dizzy, dizziness, vertigo, Holland/HAL, "not the same," along with several variations of the words "automatic door." Dkt. No. 66.

Ms. Mizeur was employed as Mr. Hausman's personal assistant at The Gold Center, Inc. from August 13, 2013 through April 4, 2015.[3] She testified that during that time, she worked with Mr. Hausman approximately 8 to 12 hours a day, five days a week, as well as on some weekends at his vacation home in Hayward, Wisconsin. *See e.g.*, Tr. Day 1, p. 73 lns. 15-23; p. 118 lns. 13–25. She further testified that her desk and computer were in Mr. Hausman's personal

---

[3] Until recently, Mr. Hausman was the owner and president of The Gold Center, Inc. in Springfield, Illinois. The Gold Center specializes in buying, selling, and refining precious metals.

office and that no other employee was stationed in his office with them. Tr. Day 1, p. 72. Finally, she states that during the time she was Mr. Hausman's personal assistant, she became intimately familiar with his lawsuit against Defendants. *See*, *e.g.*, Tr. Day 1, p. 79 lns. 2-4; p. 80 lns. 11-12 and 18-25; p. 82 lns 14-16; p. 83 lns. 11-16.

According to Ms. Mizuer, when Mr. Hausman learned that he would be required to produce copies of his emails that contained the words love, sex, relationship, HAL, doors, and/or seizures, he "panicked."

> Q:     What was [Mr. Hausman's] demeanor when he got word that he needed to produce email, personal or otherwise?
>
> A:     Pure panic. He was angry. He was just panicked. Completely panicked.

Tr. Day 1, p. 109 lns. 20-23. Ms. Mizeur further testified that immediately upon learning that he had to produce his emails, Mr. Hausman started deleting emails from his computer:

> Q:     You said he was searching and deleting?
>
> A:     Searching and deleting, yes.
>
> Q:     Thank you. And how long did this go on?
>
> A;     Several days. Non-stop. He really was not talkative. He was just glued to the computer screen.
>
> Q:     How do you know what he was doing?
>
> A:     I was standing right there. I was watching him. He had the list and he was typing them in and I watched him.

Tr. Day 1 at p. 110 ln. 19 – p. 111, ln. 1. She testified that per Mr. Hausman's directive, she also deleted all email correspondence between the two of them from her computer and phone.

> Q:     So you deleted [your email]?
>
> A:     Yes.
>
> Q:     To his satisfaction?

8

A:      Yes.

Tr. Day 1, p. 109. ln. 24 – p. 110 ln. 2. Ms. Mizuer further testified that she and Mr. Hausman

discussed hiring someone to "scrub" his computer and that Mr. Hausman claimed he had used a

large magnet to damage his home office computer's hard drive. Tr. Day 1, p. 112, ln. 3-24. When

asked why Mr. Hausman deleted his emails, she stated that he was convinced that he would lose

his lawsuit if the emails were disclosed to Defendants. Tr. Day 1, p. 111 lns. 23-25.

Lastly, Ms. Mizeur testified that Mr. Hausman had a second personal email account –

jimrhausman@yahoo.com – that he used while she was employed as his personal assistant, but

that he did not disclose this account to Defendants. Tr. Day 1, p. 117 lns. 2-12. According to Ms.

Mizeur, Mr. Hausman also deleted emails from this account. *Id.*

In support of Ms. Mizeur's testimony, Defendants produced copies of emails that she was

able to recover from her computer and/or phone after she deleted them. *See* Evid. Hearing Ex.

A3. These emails comprise approximately sixty emails from Mr. Hausman's personal email

account -- jrhausman@hotmail.com – (*i.e.*, the personal email account that he did disclose during

discovery) that were written between January 2014 and April 2015. *Id.* Approximately one-third

of the emails contain one or more words that should have triggered their production pursuant to

this Court February 5, 2015 order. *Id.* at pp. 3-9, 11-14, 18-24 (emails containing the words:

Holland America, seizure, seizures, dizziness, dizzy, and HAL). None of the emails was

produced by Mr. Hausman during discovery.

Defendants also produced copies of emails from Mr. Hausman's undisclosed personal

email account (*i.e.*, jimrhausman@yahoo.com) that Mr. Hausman had sent to Ms. Mizeur and

that she was able to recover after they had been deleted. Dkt. No. 219, Ex. 2. There are

approximately ten emails, each written in December 2013, and at least one contains one of the

9

words that would have triggered its production pursuant to this Court's February 5, 2015 order. *Id*. at p. 4. Lastly, Defendants submitted a declaration from Josh Wagoner, the general manager at The Gold Center. Dkt. No. 262. In it, Mr. Wagoner states that Mr. Hausman was "livid" when he learned that he had to produce his emails to Defendants. *Id*. at ¶ 8. In fact, Mr. Wagoner states that he had "never seen Mr. Hausman angrier than he was that day." *Id*.

### C.  Plaintiff's Response

Plaintiff concedes, as he must, that the approximately 60 emails Defendants produced from his jrhausman@hotmail.com account in support of the Motion to Vacate were not produced during discovery, and that nearly one-third of the emails contain the Court-ordered search terms. He also concedes that he did not disclose or produce any emails from his jimhausman@yahoo.com account. Nevertheless, Plaintiff testified that his failure to produce these emails was not the result of misconduct on his part. Rather, with respect to the jrhausman@hotmail.com emails, he testified that those were not produced because he had deleted them per his routine practice before Defendants requested copies of his emails. Mr. Hausman asserts that he had a practice of deleting emails "as they came in." Dkt. No. 247 at ¶ 18. He also claims that he would "delete [his] 'trash' folder and [his] 'sent' folder from time to time as it filled up." *Id*. As to the jimrhausman@yahoo.com account, he testified that he did not produce these emails because the account had gone inactive by the time Defendants requested copies of his emails.

In other words, Plaintiff charges that Ms. Mizeur was lying when she testified that she witnessed him delete "a substantial amount of emails" from his computer in response to Defendants' discovery request. Plaintiff argues that Ms. Mizeur is a disgruntled former employee of The Gold Center who was fired for forging a check from Mr. Hausman's personal checking

10

account. *See* Dkt. No. 253 at ¶ 6.  He claims that she blames him for her termination and threatened to "ruin" him if he did not "pay [her] off." Dkt. No. 247, Ex. 2. Plaintiff asserts that "[t]o the extent Ms. Mizeur's allegations are not complete fabrications," they are "colored by [her] extreme bias and misconduct, including unsuccessful extortion attempts." Dkt. No. 240 at 2.

### D.    The Court's Credibility Findings

Given the foregoing opposing allegations, the credibility of Ms. Mizeur and Mr. Hausman is at the heart of this motion: Ms. Mizeur charges that Mr. Hausman intentionally sabotaged Defendants' discovery efforts and is lying to cover his misconduct; Mr. Hausman charges that Ms. Mizeur is a bitter ex-employee who is lying because she wants to wreak havoc on his life. Thus, this Court must assess the credibility of Ms. Mizeur and Mr. Hausman. In judging the credibility of a witness and determining the weight to be given to his or her testimony, the trial court may consider the witness' demeanor and manner while on the stand, the character of his or her testimony as being probable or improbable, inconsistencies, patent omissions, and discrepancies in the testimony or between the testimony of different witnesses. *Young Ah Chor v. Dulles*, 270 F.2d 338, 341 (9th Cir. 1959). In addition, the trial court may consider contradictory testimony, the witness' interest in the outcome of the case, his or her relationship to the litigants, and any other factor weighing on the truthfulness or untruthfulness of the witness' testimony. *Id.*

### 1.    Credibility of Ms. Mizeur

This Court had the opportunity to observe Ms. Mizeur's demeanor when she testified at the evidentiary hearing. Based on this observation, the Court finds her to be a credible witness. *See Thomas v. Pacific S.S. Lines*, 84 F.2d 506, 507-508 (9th Cir. 1936); *see also*, *United States v.*

11

*Thomas*, 684 F.3d 893, 903 (9th Cir. 2012) (noting that "live testimony is the bedrock of the search for truth in our judicial system"). Ms. Mizeur answered each question put to her in a straight-forward and complete manner. When she did not know the answer to a question, she admitted it. When confronted with the emails in which she threatened to ruin Mr. Hausman's life unless he "paid her off," she admitted that she wrote them, but explained that it was done out of shock and anger at being falsely accused of a crime and fired as a result. *See, e.g.*, Tr. Day 1 at p. 145, lns. 1-19.

With respect to Plaintiff's allegation that Ms. Mizeur was fired because she forged a check from one of his personal checking accounts, the Court finds Ms. Mizeur's testimony that Mr. Hausman gave her permission to write the check credible. Ms. Mizeur testified that Mr. Hausman frequently gave her cash—sometimes as much as five thousand dollars slipped into her purse. Tr. Day 1, p. 136 lns. 2-5; p. 189 lns. 16-20. She also testified that Mr. Hausman took out a credit card in both of their names so that she could use it "to help me, you know, if I needed gas, or if my son needed something, I needed something." *Id.* at p. 77, lns. 18-20. She further testified that if she was unable to pay the credit card bill, Mr. Hausman would pay it. *Id.* at p. 78, lns. 11-12. She even testified that Mr. Hausman promised to provide for her financially in the event of his death. *Id.* at p. 75 ln. 18- p. 76 ln. 5. Lastly, Ms. Mizeur testified that Mr. Hausman was very concerned that the other Gold Center employees not find out that he was giving her cash and helping her out in other financial ways. *Id.* at p. 77, lns. 11-13, p. 189, lns. 9-13.

As to the check incident, Ms. Mizeur testified that one time when Mr. Hausman was out of town, she got into a financial "crunch" and overdrew her checking account. *Id.* at p. 136, lns. 15-25. She claims that she called Mr. Hausman to ask him if she could borrow two thousand dollars so that she could cover the outstanding checks on her account. *Id.* According to Ms.

12

Mizeur, Mr. Hausman gave her permission to take one of his checks, make it out to herself for the amount she needed, and sign his name. *Id*.; p. 136, lns. 1-3. Ms. Mizeur further testified that Mr. Hausman was very concerned that the other Gold Center employees not find out about the check, particularly Josh Fieldbinder who had access to Mr. Hausman's checkbooks. *Id*; p. 181 lns. 24-25. It is for this reason, Ms. Mizeur explained, that she took a check from the middle of the checkbook, rather than the next one in sequence: "[t]he only reason…is for the fact that [Mr. Hausman] said don't let Fieldbinder find out." *Id.* at p. 181 lns. 24-25.

The Court finds Ms. Mizeur's explanation regarding the check credible. Mr. Hausman routinely gave Ms. Mizeur money when she needed it (something Mr. Hausman does not deny) and, in this case, he was not available to give her cash, so he instructed her to write a check to herself. The Court finds it significant that Ms. Mizeur has consistently stated that Mr. Hausman gave her permission to write the check. S*ee*, *e.g*, Evid. Hearing Ex. A3 at p. 10, email from Ms. Mizeur to Mr. Hausman dated April 6, 2015 ("You said yes Amy do what u have to do just don't let Fieldbinder know and we will deal with it when I get home."); Evid. Hearing Ex. P25, Facebook message from Ms. Mizeur to Mr. Hausman dated April 10, 2015 ("You gave me permission to write that check … so I'm in no way concerned about that."); Dkt. No. 264, declaration of Josh Wagoner at ¶ 6 (stating that on the day she was fired, Ms. Mizeur "claimed she had permission from Mr. Hausman to write the check"). Likewise, it is telling that Plaintiff did not involve the police when he allegedly discovered that Ms. Mizeur stole money from him. In short, this Court finds Ms. Mizeur to be a truthful witness.[4]

---

[4] The Court also notes that one of the two witnesses who Plaintiff claimed would testify as to Ms. Mizeur's alleged reputation for untruthfulness did not actually testify to such when he took the witness stand. *See* testimony of Mark Vance, Tr. Day 1 at p. 221, ln. 23 – p. 231, ln. 6. The other witness, Josh Fieldbinder, was never called to testify. Ms. Mizeur, on the other hand, testified to Mr. Fieldbinder's alleged bias against her, stating that he "hates" her because she took over his job responsibilities when she was hired. Tr. Day 1 at p. 140 lns. 1-14.

## 2.    Credibility of Mr. Hausman

The same cannot be said for Mr. Hausman. As a witness, he came across evasive and untrustworthy. He appeared to weigh each answer, not for its truthfulness, but to assess whether it would damage his case. Mr. Hausman also seemed to capitalize on his alleged brain injury when it was convenient for him. He was confused or claimed memory loss when confronted with a question or exhibit that appeared to undermine his claims, yet was animated and full of information when his testimony supported his case.

In addition, Mr. Hausman's testimony is undermined by his own words, as evidenced by the emails that Ms. Mizeur was able to recover from her computer and phone. For instance, during the evidentiary hearing, Mr. Hausman denied that he was or had been romantically interested in Ms. Mizeur, but rather, indicated a strictly professional relationship. Tr. Day 2, p. 29 ln. 19 – p. 30 ln. 11. Yet, Mr. Hausman consistently sent Ms. Mizeur emails that contained physically intimate details that belie his testimony. *See*, *e.g*., Dkt. No. 264, Ex. 5 at p. 3. A mild example of this is an email Mr. Hausman sent to Ms. Mizeur on January 14, 2014: "if you wake up at 2 in the morning, please call me. What is wrong? Outside of me being an asshole." Evid. Hearing Ex. A3 at p. 2. These emails do not evidence a strict employer/employee relationship.

Likewise, the newly revealed emails expose grave inconsistencies with Mr. Hausman's trial testimony and cast doubt on his veracity. For instance, Mr. Hausman testified during the trial that he avoids using ladders because he is "[a]fraid of falling and hurting [himself] again." Trial Tr. Day 3, p. 270 ln. 19. However, his own email tells a very different story:

> I spent most of the day on a 10' later [*sic*], with a fire axe chopping off the ice that had accumulated over the front porch of the house, followed by the garage hose, on hot water to melt the ice, followed by a couple of avalanches of snow and ice off of the roof, followed by me scooping the snow and ice of [*sic*] of the walk way. Some of the ice was 15" thick, very heavy to pick up or scoop. I am pretty sore. Every where [*sic*]."

14

Dkt. No. 219, Ex. 1 at p. 1, email from Mr. Hausman to Ms. Mizeur dated January 14, 2014. Ms. Mizeur also testified as to her experiences with Mr. Hausman during his daily activities. According to Ms. Mizeur, she witnessed Mr. Hausman: (1) carry heavy loads (*i.e.*, bags of coins, luggage, metal shelving), (2) participate in physical activities such a refinishing a wood floor, (3) climb ladders and steep stairs without difficulty, (4) drive over 500 miles at a time, (5) sit in loud bars and restaurants without being disturbed by the noise, (6) cook meals, (7) drive and load a boat onto its trailer, (8) successfully navigate rocky beaches, and (9) load and unload heavy equipment from his vehicle. *See generally* Dkt. No. 219; Tr. Day 1. Each of these indicates normal activity and is at variance with Mr. Hauman's slow, unsteady demeanor at the trial and evidentiary hearing.

Mr. Hausman also changed his testimony when it suited his case. For instance, as stated above, Mr. Hausman testified during the trial that he avoids climbing ladders due to his alleged balance issue. However, during the evidentiary hearing, when asked about the above email he wrote, he claimed that he had only climbed "two rungs" of the ladder and reached the ice with "a ten foot long steel pole." Tr. Day 2, p. 42 lns. 18-19. When Defendants' counsel suggested that it would be difficult for someone with balance issues to handle a ten foot steel pole while standing on a ladder, Mr. Hausman changed his testimony, implying without directly stating, that the pole was actually made out of aluminum. *Id.* at ln. 22- p. 43 ln. 2 (Q: Ten-foot long steel pole has to be pretty unwieldy; isn't it? Is that pretty heavy? A: No. I used the word "steel" they also make them out of aluminum. Q: Is it steel or aluminum? A: We have them now that extend 23 feet.).

Indeed, Mr. Hausman's credibility was called into question by one of his own witnesses, John Gilliam who allegedly discovered that Ms. Mizeur had forged Mr. Hausman's signature on a check. Before the evidentiary hearing, Mr. Gilliam submitted a declaration in which he stated:

15

"on the day after [Ms. Mizeur] had processed the $2,000 check, [a] bail/bond had been paid to obtain [her] boyfriend's release from jail. *The records did not say who paid the funds*," thereby insinuating that Ms. Mizeur paid the bond with the stolen funds. Dkt. No. 249 at ¶ 21 (emphasis added). During the evidentiary hearing, Mr. Gilliam testified that the "records" he was referring to in his declaration were the bond documents Mr. Hausman pulled up on the Internet. Tr. Day 1, p. 205 ln. 20 - p. 200 ln. 6; p. 207 lns. 11-12. On cross examination, Defendants produced a copy of the bond documents from the Internet. Ex. A-1. Contrary to Mr. Gilliam's declaration, the documents clearly show that Ms. Mizeur was not the individual who paid the bond. Tr. Day 1, p. 209 ln. 25 – p. 210 ln. 1; Ex. A-1 at 6. Instead, the bond was paid by someone named Jodi Oshesky. *Id*. When Mr. Gilliam was asked why he would swear in his declaration that the bond documents did not "say who paid the funds" when in fact they did, he stated that he had never actually seen the documents, but instead relied on Mr. Hausman's statement that the documents "did not indicate…who paid the funds." Tr. Day 1, p. 207 lns. 11-12.

For the foregoing reasons, the Court concludes that Ms. Mizeur is a credible witness and Mr. Hausman is not. Applying this finding to Ms. Mizeur's allegations, the Court concludes that Ms. Mizeur testified truthfully when she stated that she witnessed Mr. Hausman delete the emails and Mr. Hausman was not truthful when he denied deleting the emails. Likewise, the Court does not find credible Mr. Hausman's assertion that the approximately sixty emails Defendants produced from his jrhausman@hotmail.com account were not produced because he had deleted them prior to Defendants' discovery request pursuant to his routine practice of deleting emails. Ms. Mizeur testified that in her time working as Mr. Hausman's personal assistant, she never observed him delete emails other than after receiving Defendants' discovery request. *Id*. at ¶ 23. Quite to the contrary, Mr. Hausman saved his routine emails. Indeed, Ms. Mizeur testified that

16

she was often tasked with searching through his old emails in order to recover documents for business purposes. *Id*. She recalls that one time she located emails "from as far back as 2003." *Id*. In addition, Defendants produced a number of emails from Mr. Hausman's accounts that appeared to be simple, mundane emails with no reason to keep. *See*, *e.g*., Evid. Hearing Ex. A2 at pp. 1, 11-13. These emails date as far back as February 2012, yet they were not deleted by Mr. Hausman, thus contradicting his claim that he routinely deleted emails.

What is more, even if Plaintiff did have a routine practice of deleting his emails (which the Court doubts), he was obligated to stop such practice with the onset of this litigation. It is black letter law that a party's duty to preserve evidence arises when he knows or reasonably should know that the evidence is relevant and when prejudice to an opposing party is foreseeable if the evidence is destroyed. *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (quoting *Fujitsu Ltd v. Fed. Express Corp*., 247 F.3d 423, 436 (2d Cir. 2001) ("As a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information…when that party 'has notice that the evidence is relevant to litigation or …should have known that the evidence may be relevant to future litigation.'"); *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("The duty to preserve documents attaches "when a party should have known that the evidence may be relevant to future litigation.'"); *Apple Inc. v. Samsung Electronics Co., Ltd*., 888 F. Supp. 2d 976, 990 (N.D. Cal. 2012) ("[T]here is no question that the duty to preserve relevant evidence may arise even before litigation is formally commenced.").

The Court does not find credible Mr. Hausman's assertion that he did not know that the emails were relevant until they were requested.[5]

Nor does the Court find credible Mr. Hausman's assertion that he simply "forgot" about the jimrhausman@yahoo.com account (*i.e.*, the personal email account that he never disclosed to Defendants). Plaintiff claims that he did not disclose the account because he only used it for a couple of months at the end of 2013/beginning of 2014 and he had forgotten about it by the time this Court ordered him to produce his emails in February 2015. Tr. Day 2, p. 8 ln. 20- p. 9 ln. 1. However, this explanation is called into question by his own words. For instance, on December 7, 2013 Mr. Hausman wrote the following email to Ms. Mizeur from the jimrhausman@yahoo.com account: "Amy, Just [*sic*] sent you a BS message on Hotmail. Someone was asking how I was communicating with you." Dkt. No. 264, Ex. 5 at 1. In another email to Ms. Mizeur, he writes: "Do not use the Gold Center email, [*sic*] to send messages. THEY CAN AND PROBABLY ARE BEING VIEWED." Evid. Hearing, Ex. A3 at p. 18 (emphasis in original). These are not statements of an individual who simply "forgot" about the existence of an email account; rather, they evidence a concerted effort to hide its existence. Indeed, after Defendants brought the existence of the jimrhausman@yahoo.com email to light, Mr. Hausman produced an email from that account that allegedly he was able to recover just before the evidentiary hearing. *See* Evid. Hearing Ex. A5. The email is to Mr. Hausman's mother in which he raves about Ms. Mizeur's virtues. *Id.* At the conclusion of the email he states: "[a]fter you get this, I would ask that you read it, understand it, and then destroy it." *Id.* at p. 3.

---

[5] Plaintiff also argues for the first time in his post-hearing brief that he had no duty to produce emails that were written after March 28, 2014. Setting aside the fact that Plaintiff had an ongoing duty to supplement his discovery responses, this argument simply does not make sense. Plaintiff concedes that he maintained his personal yahoo email account from at least the end of 2013 through the beginning of 2014. Thus, any emails written on that account would have fallen within the relevant timeframe.

The Court finds this instructive. Mr. Hausman retains his emails, except when the emails have the potential to harm him, in which case, he deletes them.

For the foregoing reasons, the Court concludes that Defendants have established by clear and convincing evidence that Mr. Hausman intentionally deleted and/or failed to disclose emails that he knew were responsive to Defendants' discovery request.

### E.   Defendants' Ability to Fully and Fairly Present Their Defense

Next, Defendant must establish that Mr. Hausman's discovery misconduct substantially interfered with their ability to fully and fairly present their defense at trial. In order to meet this burden, Defendants "need not show that the [trial] outcome would have been different absent [Mr. Hausman's] conduct." *Jones*, 921 F.2d at 879 (citing *Bunch*, 680 F.2d at 1283); *see also*, *Anderson*, 862 F.2d at 924 ("another well-sculpted marker points out that misconduct need not be result-altering in order to merit [] redress."). Rather, Defendants must show that Mr. Hausman's "misconduct substantially interfered with [their] ability to prepare the case and defend against [Mr. Hausman's claims] fully and fairly." *Catskills Development, LLC v. Park Place Entertainment Corp.*, 286 F. Supp. 2d 309, 316 (S.D.N.Y. 2003) (quoting *Monaghan v. SZS 33 Associates, L.P.*, 1992 WL 135821, *3 (S.D.N.Y. June 1, 1992)). Where discovery material is "deliberately suppressed, its absence can be presumed to have inhibited the unearthing of further admissible evidence adverse to the withholder, that is, to have substantially interfered with the aggrieved party's trial preparation." *West*, 803 F.3d at 67 (quoting *Anderson*, 862 F.2d at 924).

This Court has already concluded that Mr. Hausman intentionally deleted and/or failed to disclose the emails in his jrhausman@hotmail.com and jimrhausman@yahoo.com accounts. Therefore, Defendants are entitled to the presumption that the destruction/suppression of the

emails substantially interfered with their trial preparation. *See e.g. Anderson*, 862 F.2d at 924; *West*, 803 F.3d at 67. Thus, the burden now shifts to Mr. Hausman to establish by clear and convincing evidence that "the withheld material was in fact inconsequential." *West*, 803 F.3d at 67-68 (quoting *Anderson*, 862 F.2d at 925).

## F.    Mr. Hausman's Burden

Mr. Hausman attempts to meet this burden by pointing out that he retained an electronic discovery consultant, eDiscovery, Inc., to download and catalog his email accounts in preparation for producing them to Defendants. According to Plaintiff, eDiscovery downloaded a complete copy of his personal and business email accounts on January 27, 2014 and February 2, 2015, respectively, three days before this Court ordered him to produce his emails on February 5, 2015. Therefore, Plaintiff argues, even if he had deleted emails after he was ordered to produce his emails by this Court (*i.e.*, on February 5th), eDiscovery already had a complete copy of his emails. Given that production of Mr. Hausman's emails was made from the copies eDiscovery downloaded, any deletion Mr. Hausman did after eDiscovery downloaded his account would have been inconsequential to this lawsuit.

The fallacy with Plaintiff's argument, however, is that Ms. Mizeur does not specify that the deletions occurred after this Court's February 5, 2015 order. Admittedly, in her declaration, Ms. Mizeur states that Mr. Hausman began deleting the emails after "he received word of a Court Order requiring him to produce to [Defendants] all his emails that contained certain words." Dkt. No. 219 at ¶ 17. However, at the evidentiary hearing, Ms. Mizeur testified that she actually did not know what triggered Mr. Hausman to start deleting his emails: this Court's February 5, 2015 order, Defendant's December 31, 2014 document request for the emails, or something else altogether:

20

Q:     You don't know if it was a court order or an e-mail or what it was?

A:     No.

*See*, *e.g.*, Tr. Day 1, p. 188 lns. 18-19  In light of the evidence presented, the Court concludes it was Defendants' December 31, 2014 document request that triggered Mr. Hausman's actions. First, Ms. Mizeur testified that the search terms that had Mr. Hausman particularly upset were: love, sex, and relationship. These search terms were included in Defendants' December 31, 2014 document request; they were not included in this Court's February 5, 2015 order. Second, as discussed earlier in this order, nearly one-third of the emails produced by Defendants in support of the instant motion (*i.e.*, the approximately sixty emails from Mr. Hausman's jrhausman@hotmail.com account that were not produced in discovery) contain the relevant search terms, thereby suggesting that the emails were deleted before eDiscovery downloaded the account. *See*, e.g., Dkt. No. 219, Ex. 1. Accordingly, assuming that Mr. Hausman began deleting the emails after he received Defendants' document request on December 31, 2014, the emails were long gone before eDiscovery downloaded his email accounts on February 2, 2015.

Next, Plaintiff argues that the deleted emails were not relevant to this lawsuit. As evidence of this, he points to the fact that several of the emails did not contain one of the Court-ordered search terms and, thus, would not have been produced. However, as stated above, given that this Court has determined that Mr. Hausman deliberately deleted emails for the purpose of keeping evidence from Defendants, the Court must assume the deleted or non-disclosed emails were relevant. *Anderson*, 862 F.2d at 925; *see also*, *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1205–06 (8th Cir. 1982) (where documents deliberately destroyed, district court erred in failing to draw factual inferences adverse to party responsible); *Telectron, Inc. v. Overhead Door Corp*, 116 F.R.D. 107, 134 (S.D. Fla. 1987) (where destruction motivated

21

by "flagrant bad faith," conduct "warrant[ed] the inference that the destroyed documents would have been harmful to [destroyer]"; resultant unavailability "must therefore be seen as prejudicial to [innocent party's] interest in pursuing the full and fair litigation of its claims"); *National Association of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Cal. 1987) ("Where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party.").

Indeed, just the one document produced by Mr. Hausman from his yahoo account—the email to his mother—provides a treasure trove of information. Evid. Hearing Ex. A5. For instance, it reveals that his wife's behavior may be the cause of Mr. Hausman's alleged symptoms (stating that Ms. Hausman's "pack rat" tendencies sends him into "convulsions/shaking"), that Ms. Mizeur was intimately involved in his daily life (stating that Ms. Mizeur "is like [his] left arm"), and, perhaps most importantly, it reveals that Mr. Hausman takes tranquilizers (stating that he has "to take tranquilizers to go home"). *Id.* While, admittedly, this letter does not contain one of the Court ordered search terms, the Court is not willing to assume that it would not have been produced had Mr. Hausman not sabotaged Defendants' discovery efforts. It is impossible to know what Defendants would have discovered in the yahoo account had it been disclosed, and likewise, it is impossible to know where those discoveries would have led. Indeed, perhaps they would have led to the email in the jrhausman@hotmial.com account in which Mr. Hausman admits that he is suffering from depression and taking Xanax for the condition. *See* Dkt. No. 219, Ex. 1 at 2. Clearly, such information is relevant to Defendants' defense.[6]

---

[6] One of Defendants' expert witnesses testified at trial that Plaintiff's seizures are really pseudo seizures triggered by anxiety.

Lastly, Plaintiff argues that Defendants waived their right to object to the deleted emails because they were aware that he had deleted them at least five months before the trial started. He points out that Defendants threatened to seek sanctions on this issue, but never followed through on the threat. As such, Plaintiff argues, it is too late for Defendants to object now. There are at least two problems with this argument. First, as Mr. Hausman concedes, he failed to disclose— *entirely*—the existence of the jimrhausman@yahoo.com email account. Defendants cannot be said to have waived their right to the emails in an account that they did not even know existed. Second, Mr. Hausman did not reveal to Defendants that he systematically searched for and deleted emails that contained the Court-ordered search terms. Rather, he simply claimed that he had a routine practice of deleting emails. These statements are very different. One makes clear that the deletion was done for nefarious reasons, the other is much more innocent. While the former most certainly would have triggered a sanctions motion, the other may not.

For the foregoing reasons, the Court concludes that Plaintiff did not meet his burden of establishing by clear and convincing evidence that the withheld information was inconsequential.

### G.     Ms. Mizeur's Remaining Allegations

Ms. Mizeur also testified that when Mr. Hausman prepared her for her interview with Defendants' attorneys, he ordered her to lie about the amount of alcohol he consumes on a daily basis and the fact that he was staying in local hotels instead of living at home. She also claimed that Mr. Hausman "insisted on sitting in the office and secretly listening to [her] when [she] was interviewed by telephone" by Defendants' attorneys. *Id*. at ¶ 13. She further alleged that during the interview, he would "signal [her] not to say any more or to be quiet when he thought [she] was saying too much." *Id*.

However, during the evidentiary hearing, Ms. Mizeur testified that while she was prepared to lie during her interview with Defendants' attorneys if it was necessary to avoid harming Plaintiff's case, ultimately, she did not have to lie because they did not ask her anything that she felt would hurt his case. In addition, Ms. Mizeur's allegations with respect to eavesdropping on the other Gold Center employees' interviews at the request of Mr. Hausman, as well as her claim that he watched the interviews on the Gold Center's security cameras, do not establish that he actually tampered with any witnesses. Accordingly, the Court finds that Defendants have failed to establish that Plaintiff tampered with witnesses' testimony.

## IV.   CONCLUSION

It is this trial judge's responsibility to ensure that a party is not the victim of a miscarriage of justice. *Murphy*, 914 F.2d at 187. Based on the evidence presented at the evidentiary hearing, this trial judge concludes that a miscarriage of justice occurred in this case.[7] Accordingly, the Court HEREBY:

1.   GRANTS the Motion to Vacate (Dkt. No. 216);

2.   VACATES the Judgment entered in this case (Dkt. No. 207); and

3.   ORDERS a new trial.

Dated this 5th day of January, 2016.


_____
Barbara Jacobs Rothstein
U.S. District Court Judge

---

[7] In granting this Motion, the Court is in no way suggesting that Plaintiff's attorneys were involved in his misdeeds. To the contrary, in the Court's view, Plaintiff's counsel displayed professionalism and integrity throughout this litigation.

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25